**AFFIRM; and Opinion Filed May 27, 2015.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-14-01569-CV

## IN THE INTEREST OF J.W.C., A CHILD

On Appeal from the 301st Judicial District Court
Dallas County, Texas
Trial Court Cause No. DF-13-17254-T

# MEMORANDUM OPINION
Before Justices Lang, Brown, and Whitehill
Opinion by Justice Brown

In this accelerated appeal, Mother and Father appeal the trial court's decree of termination, terminating their parental rights to their son J.W.C. following a jury trial.[1] They raise three issues on appeal, challenging the legal and factual sufficiency of the evidence to support the jury's findings. For reasons that follow, we affirm the trial court's decree of termination.

### BACKGROUND

J.W.C. was born to Mother and Father on May 3, 2013. Mother has five older children, J.H., J.A.S.C., J.A.L.C., N.C., and G.C., born between January 2006 and February 2012. Father is the father of all these children, except J.H. In January 2012, the year before J.W.C. was born, and shortly before G.C. was born, the Dallas County Child Protective Services Unit of the Texas

---

[1] *See* TEX. R. JUD. ADMIN. 6.2(a) ("In an appeal of a . . . suit affecting the parent-child relationship filed by a governmental entity for managing conservatorship," courts of appeals should, "so far as reasonably possible, ensure that the appeal is brought to final disposition" within 180 days of date notice of appeal is filed).

Department of Family and Protective Services received a referral alleging physical neglect of the children. In May 2012, J.H., J.A.S.C., J.A.L.C., N.C., and G.C. were removed from Mother and Father's home. In early 2013, still before J.W.C. was born, these children were returned to the home one by one over several weeks. After a September 12, 2013 referral about the family's living conditions, when J.W.C. was four months' old, the five older children were removed from the family's apartment. At that point, CPS filed an emergency motion to remove J.W.C. from the home and sought temporary and permanent managing conservatorship of him and sought to terminate Father's and Mother's parental rights. Father and Mother turned J.W.C. over to CPS a few days later.

At the trial court's suggestion, the parties mediated the case involving the five older children. They reached a mediated settlement agreement by which Father and Mother agreed to terminate their parental rights to J.A.S.C., J.A.L.C., N.C., and G.C. In a separate mediated settlement agreement, Mother agreed to also terminate her parental rights to J.H. In two separate October 2013 decrees, the trial court terminated Father's and Mother's parental rights to J.A.S.C., J.A.L.C., N.C., and G.C., and Mother's parental rights to J.H.[2]

The jury trial on the department's petition to terminate Mother's and Father's parental rights to J.W.C. took place in August 2014. Nicky Hannah, an investigations supervisor with CPS, testified that on January 21, 2012, prior to J.W.C.'s and G.C.'s births, CPS received a referral alleging that Mother and Father had neglected their four children.[3] Specifically, the referral alleged the children did not have clean clothes or diapers to wear and were outside naked in 35-degree weather. The referral further alleged the family was about to be evicted for

---

[2] Father appealed the decree of termination to which he was a party to this Court. We affirmed. *See In re J.A.S.C.*, 430 S.W.3d 544 (Tex. App.—Dallas 2014, no pet.) (mem. op.).

[3] Referrals involving the children Mother and Father have together date back to 2010. In June 2010, a referral was made alleging medical and physical neglect of J.A.L.C, and in December 2010, a referral was made alleging neglectful supervision of J.A.S.C. and J.H. These allegations were ruled out.

nonpayment of rent, which had happened "countless times" before. An affidavit from another caseworker, Dara Young, indicated there were actually three referrals made about the family that day, two of which stated the children appeared malnourished. CPS investigated the claims and found there was reason to believe physical neglect had occurred. The family was referred to the department's Family Based Safety Services (FBSS), a program that offers services to parents such as psychological services and nutritional counseling while the children remain in the home.

Dr. Matthew Cox, a pediatrician at the Referral and Evaluation of At-Risk Children (REACH) clinic at Children's Medical Center, testified that the clinic started seeing J.A.L.C. and N.C. in late January 2012 for failure to thrive. The children were brought in at the request of CPS. Then, in late March 2012, when G.C. was five-weeks' old, the clinic started seeing him for failure to thrive also. Dr. Cox explained that failure to thrive means a child is not gaining weight as expected. For example, when G.C. was born, he was in the 25th percentile for weight. That meant that if there were 100 newborns in a room, he would be number 25 on a list from smallest to largest. Normal range is anything between the fifth and 95th percentile. When the clinic saw him at five weeks of age, he was less than the fifth percentile. After G.C. was removed from his parents in May 2012, his weight gain improved and he went back to being at the 25th percentile and then grew to almost the 50th percentile.

When the REACH clinic started following N.C., she was fourteen months' old and weighed only seven-and-a-half pounds. Dr. Cox testified that this was significantly less than the fifth percentile. N.C. was more the size of a six-month-old than a fourteen-month-old. Cox indicated that, although N.C. did gain weight during the time the family was bringing her to the clinic, she was still in the less than fifth percentile at the time she was placed in foster care. Like G.C., her weight gain improved greatly once she was placed outside her parents' home. At the time of trial, N.C. was more appropriately at the 25th percentile. J.A.L.C. was also small for her

–3–

age and in the less than fifth percentile. After she was placed in foster care and her home environment changed, her failure to thrive was resolved. At the time of trial she was between the 25th and 50th percentiles. Dr. Cox testified that, for each of these three children, the cause of his or her failure to thrive was inadequate nutrition.

Dr. Cox further testified that the REACH clinic educated parents about how often and what to feed their children. Mother and Father received this type of education in the clinic, which included recommendations about ways to improve the children's caloric intake and information about formula preparation for the baby G.C. The parents also received nutritional counseling from FBSS. Dr. Cox stated that Father was not receptive to the clinic's education efforts. Father provided little detail about G.C. and what had been going on at home. In between visits, he did not follow through on going to the Women and Infant Child Service (WIC) office, which provides milk, formula, and other nutritional substances for young children, to get needed formula support. Further, Father expressed to Dr. Cox that there was nothing wrong with his children — they were just small. Cox noted that Father was "quite angry." Later, on a May 1, 2012 visit, Cox noted that Father was receptive and more talkative. Dr. Cox never met Mother, although there was evidence she did bring the children to the clinic at other times to see a nurse practitioner.

Dr. Cox noted that the children always appeared dirty and unkempt at the clinic and there was a concern they were neglected physically in addition to nutritionally. Based on what he saw in the clinic, he would be worried about the care the parents provided. The fact that three of their children had failure to thrive that was resolved once they were put in a different environment speaks to the level of care the children were receiving at home. Cox is a board certified child abuse pediatrician with training and experience in performing child abuse evaluations. In his opinion, the neglect shown to these children was a form of child abuse. Based on what happened

–4–

with the three children from this family he treated at his clinic, Dr. Cox was concerned that if any child was returned to these parents, he or she would be in danger.

Erin Mayrell with FBSS conducted a home visit with the family on April 27, 2012. Mayrell's affidavit indicated the family was living in a hotel at that time. She reported that the children were dirty and were wearing dirty diapers. Father remained asleep during Mayrell's visit even though he was aware she was there to conduct a home visit. Mother's affect was "flat," and she did not respond when asked if she understood the services being recommended. J.A.L.C., age two and a half, asked Mayrell if she had enough car seats to take all the children with her. J.A.S.C. opened the hotel door and ran out of the hotel room. J.A.L.C. and N.C. followed. After about twenty minutes of running around the hotel complex, Mother was able to get the children back in the room. Father remained asleep during this incident.

Alejandra Vasquez, who was employed by CPS in its FBSS program, gathered information and compiled a report about the family's referrals. She testified that on May 2, 2012, the department received a referral regarding a visit Mother and the children made to the WIC office to redeem a prescription for Pediasure. It was alleged that Mother was having some detachment from the children and might be suffering from depression. Mother kept her head down, made no eye contact with staff, and did not watch her children. While in the waiting area, J.A.L.C. removed her diaper and ran around with it in her hand, screaming and climbing on chairs. Mother was indifferent to J.A.L.C.'s behavior. A WIC employee observed that J.A.L.C. had a rash in her vaginal area, did not pronounce short sentences clearly, and had questionable social skills for her age. The person making the referral had also observed the family at the WIC office in March. At that time, the children were dirty. Father was feeding G.C. out of a dirty bottle, and N.C. also drank out of that bottle. The department was granted temporary managing conservatorship of J.H., J.A.S.C., J.A.L.C., N.C., and G.C. on May 10, 2012.

These five children were returned to Mother and Father one by one over a period of several weeks in early 2013. At that time, the parents were receiving approximately $1,100 in food stamps each month and were also getting food from WIC. FBSS monitored the children's return to their parents' care.

In February 2013, Betty Cannon was called in to work with Mother and Father. Cannon is a licensed professional counselor who does contract work for CPS. When Cannon first started working with the family, they lived in Mesquite at the Trade Wind apartment complex. Cannon did psychosocial assessments of Mother and Father to assess their ability to provide a structured, nurturing, caring environment for the children. Cannon determined that Father was raising the children based upon his awareness of how he was raised. Father grew up in a home that did not have a structured time to eat or go to bed, for example. Mother's background was similar to Father's in that she did not have a routine schedule growing up. Nurturing and social and educational stimulation were not a priority in her early childhood which explained why these things were not a priority in her life with her children.

Cannon's goal was to explain the importance of a bedtime schedule and feeding the children three healthy meals, as well as snacks, throughout the day. She also advised the couple on keeping up with the children's medical records and personal hygiene and keeping the home in a "sanitized manner." Cannon was initially scheduled to meet with the family once a week, but would meet with them more often if needed. After all five children were returned to the home, Cannon worked with the parents to set a schedule for mealtimes. They also worked on a nutritional menu. Cannon gave homework assignments to the parents. The primary assignment was to feed the children three times a day. Cannon visited the family at mealtimes to see what they were eating and if they were keeping the mealtime schedule she put in place. Initially, Cannon showed up at dinnertime, and Father had prepared a meal. He did well for "maybe a

week or so, two or three days." Then Cannon started showing up at other mealtimes. J.A.S.C. would meet Cannon at the door and tell her they were hungry and hadn't had anything to eat. J.A.S.C. was also not properly dressed. At some point, when providing three meals a day was too much, Cannon changed the goal to feeding the kids twice a day, with a snack in between. After J.W.C. was born, Cannon changed the goal to feeding the kids something every two to four hours because that was how often J.W.C. needed to eat. On her last visit to the parents' home before the older kids were removed for the second time, Cannon did not see any food in the refrigerator besides a "jug of milk." Cannon stated she thought the parents were going back to the old patterns of behavior they practiced when they were children.

In July 2013, Vasquez received a phone call from Betty Cannon, who stated there was a continuing problem with the children being fed. Vasquez visited the family on July 17, 2013 at about 10 am, at their two-bedroom apartment at the Trade Wind apartment complex in Mesquite. Mother and Father knew Vasquez was coming. Mother was upstairs asleep. During the visit, Father eventually went upstairs to wake her, and she came downstairs. G.C. had a bloody nose, as well as a bruise on the side of his face and what looked like a bite mark on his face. J.A.S.C., who was almost five, climbed on the kitchen counter and grabbed a piece of cold pizza. She also pushed a chair to the counter to get food from the top of the refrigerator. J.W.C. was propped up on the couch wearing only a diaper, even though it was cold in the apartment. J.A.L.C. was stuffing slices of bread in her mouth, and G.C. was picking up the crumbs from the floor and eating them. In an affidavit, Vasquez stated the children were running back and forth from the kitchen to the living room with pizza, hotdogs, loaves of bread, and single serving apple pies. N.C.'s diaper was sagging because it was heavy. Father changed the diaper once Vasquez brought it to his attention.

Vasquez asked to see the feeding schedule for the children. It took Mother a while to find it, and when she handed it over to Vasquez, it appeared as if she had just written down the previous day's information. Vasquez did not see any writing from earlier days. Vasquez advised that Mother and Father were supposed to fill out the feeding schedule daily.

Vasquez believed the family lived at the Trade Wind apartment for about a year and that was the longest they had lived in one place. They moved from there to a two-bedroom apartment at the Delta Plaza apartment complex in August 2013. Vasquez visited the family there twice and opined that it did not have sufficient living area for two adults and six kids. On her second visit there, she saw people dealing drugs. While living at the Delta Plaza, all six kids started going to a nearby day care for which CPS paid.

Cannon also testified about the Delta Plaza apartments. She described "all kind[s] of women dressed like prostitutes, hookers, pimps, selling drugs, people sitting outside talking, cursing, drinking, intoxicated" at the complex. She testified it was "very, very inappropriate" for children. Cannon advised Father not to let the kids outside the apartment complex and to turn the TV up so they won't have to hear the noise taking place. Cannon asked Father to explain why he would move his family there at a time when he knew she was monitoring them and knew the judge would see a copy of her report. Father said he was trying to save money so he could get the type of apartment he wanted. The family had to move often because they were being evicted. Cannon stated that Father was inconsistent in maintaining employment and a stable amount of money to take care of the bills. Cannon indicated in a written report that the parents had concerns about the Delta Plaza apartments. Mother was fearful about the unsafe environment, and Father didn't want to live there long because of its condition.

On September 12, 2013, there was a referral about the family's living in the unsafe apartment complex. The five older children were removed from the apartment on that day.

–8–

Vasquez was present when the children were removed. According to her, there was inadequate food in the apartment, and a gallon of spoiled milk in the refrigerator. J.W.C. was not removed at that time because there were no orders in place concerning him. CPS then filed an emergency motion to remove J.W.C. from the home, which the trial court granted on September 16. Mother and Father delivered J.W.C. to a CPS office.

Shortly after the children were removed from the Delta Plaza apartments, code officers for the City of Dallas executed a warrant to inspect the property for code compliance, and police came along for their safety. Dallas Police Officer Justin Hellenguard testified the complex had been taken over by drug dealers and that police had been getting complaints about the location since 2011. On September 17, 2013, police went into every apartment in the complex and found drugs in eleven out of thirty-two units. Police found substantial amounts of PCP, cocaine, and marijuana. They also found thirty-eight firearms and over $21,000 in cash. Based on his knowledge of the property, Hellenguard testified the apartment complex was not a safe place for children. Betty Cannon testified the apartment complex was later condemned and shut down. At the time of trial, the complex was under new management and was safer.

Code Officer Sherry Steele testified that on September 17, 2013, she found a total of twenty-six violations at the Delta Plaza apartments, including litter, pest control problems, and life hazards. Steele testified that a life hazard was something on the property that has immediate danger to it. In this case, it was rebar protruding out of railroad ties in an open area on the property. She testified the complex was not a safe place to live in September 2013.

Cannon continued to work with Mother and Father off and on after the children were removed until May 2014. The last time she saw them was at the CPS office for a visit. They were living in a motel, the Cole Manor Motel. Every time she tried to visit them there, she could

not find them. Cannon also testified that both Mother and Father "aggressively pursued employment" after the children were removed.

Cannon described Mother's and Father's interactions with the children. Most of the interactions involved redirecting the kids from behavior problems. The oldest child, J.H., had very little interaction and seldom laughed or smiled. Most of the time, J.W.C. was in his bassinet. When he cried, Mother would pick him up and hold him. They would also feed him, but there was not a lot of playfulness. Cannon also described the kids' social deprivation — the children basically stayed in the home all the time. They seldom went out and were limited to just a home environment.

Cannon did not observe any health or underweight issues with J.W.C. He appeared to be growing and thriving. Cannon testified that her goal was to teach Mother and Father "the importance of nutritional values, structure, discipline in the home, social stimulation, education stimulation" and that these goals had not been reached. She also testified that the parents were not attempting to reach those goals. Because they had not made any type of changes concerning the importance of practicing these skills, J.W.C. will be subject to the same thing the other kids were subject to. Cannon did not observe any substantial progress in their parenting skills and would have great concerns about placing J.W.C. back into the same set of circumstances she had seen before. Cannon thought it would be a danger to J.W.C. to place him back in his parents' home and also not in his best interest.

Holly Edwards is a CPS caseworker who works with families when the children are in the legal custody of the State. Edwards identified State's Exhibit numbers 6 and 7 as the service plans for Mother and Father concerning J.W.C. In their previous legal case involving the other kids, she went over what services they were expected to do. These services were grandfathered into this case, and both parents agreed to work the services. They completed all of their services,

but were discharged unsuccessfully from their service with Betty Cannon. Edwards testified that Father appears unable to meet the children's dietary, developmental, and educational needs and that the home lacks appropriate space to prepare food or provide developmental stimulation.

The parents gave the department the names of three people, two family members and one family friend, with whom the children could possibly be placed. In late October or early November of 2013, J.W.C. was placed with the family friend, but was returned to the department's care after a dispute arose. The department also did a home study on J.W.C.'s uncle who lived in Tennessee, but after the home study was approved, the uncle withdrew his willingness to be a placement because Father and Mother were harassing him. An aunt lived in Vermont, but Vermont never completed a home study on her and it was impossible for CPS to do one without that State's cooperation. Edwards stated that J.W.C. had been with a foster family since January 2014, and the department's plan was for him to be adopted by his foster family. Four of his siblings were with that family too.

Kimberley Higgins, a CPS supervisor, testified that, between the first case involving the older children and the second case involving J.W.C., the department had worked with the family for two years and eight months and there had not been any progress. Higgins testified about the final report prepared by Betty Cannon, which Cannon had brought in that morning. The report reiterated that the parents had failed to meet the goals Cannon put in place for them.

Father also has three older children with a different mother, K.C., J.C., and S.C., and Vasquez investigated numerous prior referrals involving them. She investigated a May 2000 Florida referral that came in when Father's oldest child, K.C., was one month old. The referral alleged that Father and the child's mother had been leaving the grandmother to care for the child. The child had no formula for eight hours. The house smelled bad, and one could smell it from

the road. The family left and their whereabouts were unknown. A statewide alert was made, but the case was closed when the family could not be located.

The family subsequently came to Texas. Two months after they moved to Texas, in October 2000, CPS received a referral regarding K.C. It alleged physical neglect, including severe diaper rash the parents refused to treat, a filthy home (a motel room), and lack of bonding. The next referral came in August 2001. It alleged physical abuse and physical neglect of K.C. The child was removed from the home on August 23, 2001, and placed in foster care. She was returned to her parents in April 2002, with ongoing FBSS. The next referral was in August 2004. It alleged neglectful supervision and physical neglect of K.C., J.C., and S.C., by Father and the children's mother, but the case was closed because the family could not be located. There was another referral in October 2005, alleging physical neglect. The department's investigation revealed the home was unsanitary and unsafe. The case was closed with no additional services. The next referral came in April 2006, alleging physical neglect of K.C., J.C., and S.C. It was alleged the children had lost a significant amount of weight and the home was filthy. The case was closed when the family could not be located. Apartment staff disclosed the family had been evicted.

Father and Mother both testified at trial. Father testified that K.C., J.C., and S.C. lived with their mother in Terrell. Father testified that on January 31, 2014, he was hospitalized for a month due to a massive blood clot in his aorta. After that he was paralyzed in his lower limbs and in a wheelchair until late April and then on crutches until July. He testified about how his health issues impacted his and Mother's living and job situations. In January 2014, Father and Mother were both working at Rudy's Tortillas. They had worked there only one month. After the older children were removed from the Delta Plaza apartments, the parents took J.W.C. to stay with friends for a few days until they had to turn him over to CPS. They then went back to the

Delta Plaza for about a week, and then moved to the Spanish Lagos apartments in Mesquite. Due to Father's health problems, they weren't able to keep the apartment or the vehicle they had. Mother couldn't continue to work because she doesn't have a driver's license. After Father got out of the hospital, they moved to the Cole Manor motel. Two months' later, they moved to the Knights Inn motel. At the time of trial, they had been living in the Budget Suites for one month. Father characterized it as an apartment rather than a motel, stating it was furnished and had a living room, kitchen, bathroom, and bedroom. They chose it because it was very nice, affordable, and close to their jobs. Father and Mother were both working for Mary Kay in their warehouse. When asked why he had picked out the Delta Plaza apartments, Father testified he did so because a friend of his knew the manager and they could get in with a low deposit. They signed a six-month lease, but only intended to stay a month or two. Father worked for a landscaping company at that time, and Mother wasn't working. Father testified that they were getting $1,100 a month in food stamps on a card, but they had really just gotten the first $1,100 in August 2013. A food truck at which they used to purchase food had used their card number to steal their funds.

Father acknowledged there were times he didn't follow the meal schedule Betty Cannon worked with them on. He testified they just wanted to do things their own way and he was being immature about being told what to do. He also acknowledged it had been their history to move from place to place and that they had had several different employers. In Father's opinion, it would be easier financially to raise one child instead of six and easier to find a place to live. They were overwhelmed trying to raise six children. But Father did not think he had ever endangered J.W.C. or put him at risk, and he wanted him back. Father acknowledged they had been provided resources to help them get their children back, namely, counseling, parenting classes, supplies from WIC, day care, and food stamps.

Mother testified she was working in home health care at the time the kids were removed in September 2013. She estimated she had four jobs in the last three years, but when all the kids were in the home, she was a stay-at-home mom. Mother testified she wanted the opportunity to raise J.W.C. She noted they hadn't had the chance to raise him without the other five children and thought it would be easier to raise just him. She further testified she had her tubes tied after J.W.C. was born.

The jury found that both Mother and Father had knowingly placed or knowingly allowed J.W.C. to remain in conditions or surroundings which endanger his physical or emotional well-being. They also found that Mother and Father had engaged in conduct or knowingly placed J.W.C. with persons who engaged in conduct which endangers his physical or emotional well-being.[4] The jury further found that it was in the best interest of J.W.C. to terminate the parent-child relationship between him and Mother and between him and Father. In accordance with the verdict, the trial court terminated the parental rights of both Mother and Father to J.W.C. This appeal followed.

## SUFFICIENCY OF THE EVIDENCE

In their first two issues, Mother and Father contend the evidence is legally and factually insufficient to support the jury's findings that: 1) they had knowingly placed or knowingly allowed J.W.C. to remain in conditions or surroundings which endanger the physical or emotional well-being of the child; and 2) they had engaged in conduct or knowingly placed J.W.C. with persons who engaged in conduct which endangers the physical or emotional well-being of the child.

---

[4] While J.W.C. was in the department's custody, his parents had a court-ordered right to visitation every Friday for two hours. From January 2014 to the time of trial in August, they had missed twelve visits, sometimes not calling to cancel. Based on this evidence, the charge asked the jury if Mother and Father had constructively abandoned J.W.C. The jury did not answer the constructive abandonment questions.

–14–

Because termination of parental rights is "complete, final, irrevocable and divests for all time" the natural right existing between parents and their children, the evidence in support of termination must be clear and convincing "before a court may involuntarily terminate a parent's rights." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48 (1982)); *see In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014). "Clear and convincing evidence" is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2014).

On appeal, we apply a standard of review that reflects the elevated burden at trial. *In re A.B.*, 437 S.W.3d at 502; *In re A.T.*, 406 S.W.3d 365, 370 (Tex. App.—Dallas 2013, pet. denied). This means both legal and factual sufficiency review of a decree terminating parental rights require a reviewing court to consider all the evidence to determine whether the factfinder could reasonably form a firm belief or conviction that the grounds for termination are proven. *See In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002). In evaluating the evidence for legal sufficiency in a termination case, we view the evidence in the light most favorable to the finding. *Id.* at 266; *In re T.A.D.*, 397 S.W.3d 835, 839 (Tex. App.—Dallas 2013, no pet.). We "consider all the evidence, not just that which favors the verdict," and we assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam); *In re J.F.C.*, 96 S.W.3d at 266. We also disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *In re J.F.C.*, 96 S.W.3d at 266.

In reviewing termination findings for factual sufficiency, we consider and weigh all of the evidence. *Id.*; *see also In re A.B.*, 437 S.W.3d at 503 (noting reviewing court must undertake "exacting review of the entire record with a healthy regard for the constitutional interests at

–15–

stake") (quoting *In re C.H.*, 89 S.W.3d 17, 19 (Tex. 2002)). We give due deference to the decisions of the factfinder because the factfinder is the sole arbiter when assessing the credibility and demeanor of witnesses and do not supplant the judgment with our own. *In re A.B.*, 437 S.W.3d at 503; *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam). We determine, on the entire record, whether the evidence is such that a factfinder could reasonably form a firm conviction or belief about the truth of the allegations against the parent. *In re A.B.*, 437 S.W.3d at 506.

### Statutory Grounds for Termination

A trial court may terminate the parent-child relationship if the factfinder finds by clear and convincing evidence that (1) the parent committed one or more of the enumerated acts or omissions justifying termination under section 161.001(1) of the Texas Family Code and (2) termination of parental rights is in the child's best interest. TEX. FAM. CODE ANN. § 161.001(1)(A)–(T), (2) (West 2014). Both elements must be established, and each required finding must be based on clear and convincing evidence. *In re A.T.*, 406 S.W.3d at 370. "Only one predicate finding under section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

In this case, the jury found Mother and Father each had engaged in conduct proscribed by subsections (D) and (E) of section 161.001(1) of the family code. That is, the jury found Mother and Father each had (1) knowingly placed or knowingly allowed J.W.C. to remain in conditions or surroundings which endangered his physical or emotional well-being, TEX. FAM. CODE ANN. § 161.001(1)(D), or (2) engaged in conduct, or knowingly placed J.W.C. with persons who engaged in conduct, which endangered his physical or emotional well-being, *id.* § 161.001(1)(E).

–16–

They challenge the legal and factual sufficiency of the evidence to support these findings in their first and second issues.

Both subsections (D) and (E) require proof of endangerment. *See id.* § 161.001(1)(D), (E). "Endanger" means to expose to loss or injury, or to jeopardize a child's emotional or physical health, but it is not necessary that the conduct be directed at the child or that the child actually suffer an injury. *Castaneda v. Tex. Dep't of Protective & Regulatory Servs.*, 148 S.W.3d 509, 521–22 (Tex. App.—El Paso 2004, pet. denied) (citing *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). The primary distinction between the two subsections is the source of the physical or emotional endangerment to the child. *Id.* at 522. Subsection (D) addresses the child's surroundings and environment while subsection (E) addresses parental misconduct. *Compare* TEX. FAM. CODE ANN. § 161.001(1)(D), *with id.* § 161.001(1)(E).

Termination under section 161.001(1)(E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious "course of conduct" by the parent is required. *C.B. v. Tex. Dep't of Family & Protective Servs.*, No. 08-14-00224-CV, 2014 WL 6961525, at *4 (Tex. App.—El Paso Dec. 9, 2014, pet. denied); *In re D.T.*, 34 S.W.3d 625, 634 (Tex. App.—Fort Worth 2000, pet. denied). The parent's conduct may include a parent's actions before the child's birth and both before and after the child has been removed by the department. *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied); *see C.B.*, 2014 WL 6961525, at *4. A factfinder may consider the parent's conduct toward other children to find endangerment of a child not yet born at the time of the conduct. *In re W.J.H.*, 111 S.W.3d 707, 716 (Tex. App.—Fort Worth 2003, pet. denied), *superseded by statute on other grounds as stated in In re D.A.R.* , 201 S.W.3d 229, 230 n.1 (Tex. App.—Fort Worth 2006, no pet.); *see Clark v. Clark*, 705 S.W.2d 218, 219 (Tex. App.—Dallas

1985, writ dism'd). Termination of the parent-child relationship is not justified when the evidence shows merely that a parent's failure to provide a more desirable degree of care and support is due solely to misfortune or lack of intelligence or training and not to indifference or malice. *In re S.M.*, 389 S.W.3d 483, 493 (Tex. App.—El Paso 2012, no pet.) (citing *Clark v. Dearen*, 715 S.W.2d 364, 367 (Tex. App.—Houston [1st Dist.] 1986, no writ)).

We begin by considering the sufficiency of the jury's finding under section 161.001(1)(E). In challenging the sufficiency of the evidence to support this finding, the parents maintain that J.W.C. was not endangered because, when he came into the department's care at the age of four months, he was healthy and well-nourished. They also assert the evidence showed they were improving their parenting skills.

Three of J.W.C.'s five older siblings were diagnosed with failure to thrive in Mother and Father's care. The cause of the failure to thrive was inadequate nutrition. After they were removed from the home and placed in foster care, the children returned to a healthy weight and the failure to thrive was resolved. Mother and Father were educated about how to meet their children's nutritional needs, both at the REACH clinic and through FBSS. Further, Betty Cannon worked with them in their home to set up a schedule of meals and mealtimes. Mother and Father's primary assignment was to feed the children three times a day. For a few days, when Cannon came over at mealtime to check on them, Father had a prepared a meal. But then the parents reverted back to their old patterns of behavior, and the children complained to Cannon they had not been fed. They were observed fending for themselves on Vasquez's visit. Cannon's goal to get Mother and Father to feed their children regular meals on a schedule was not reached, and she testified that the parents were not attempting to reach this goal. Even Father admitted at trial that at times he did not follow the schedule Cannon put in place. He testified they wanted to do things their own way and he was immature about being told what to do. CPS

Supervisor Higgins testified that the department had worked with Mother and Father for two years and eight months without progress. There was evidence that Father had engaged in a similar course of conduct with his three older children twelve years earlier. Dr. Cox testified that, based on his observations at the REACH clinic, if any child was returned to these parents, he or she would be in danger. Like Dr. Cox, Cannon also testified it would be a danger to J.W.C. to place him back in his parents' home.

The evidence showed Mother and Father engaged in a course of conduct of not meeting three of their young children's nutritional needs. It was not necessary to show J.W.C.'s nutritional needs had not been met. *See In re A.B.*, 412 S.W.3d 588, 600–01 (Tex. App.—Fort Worth 2013), *aff'd*, 437 S.W.3d 498 (Tex. 2014) (where one child was diagnosed with failure to thrive, evidence was sufficient to support verdict that father had endangered both that child and another child); *see also In re T.T.F.*, 331 S.W.3d 461, 483–84 (Tex. App.—Fort Worth 2010, no pet.). After viewing all of the evidence under the appropriate standards of review, we conclude the factfinder could have reasonably formed a firm belief or conviction that Mother and Father each engaged in conduct which endangered J.W.C.'s physical or emotional well-being. Accordingly, we conclude the evidence was legally and factually sufficient to support the termination finding for Mother and Father under subsection (E). We overrule Mother and Father's second issue. Because we have upheld the jury's finding under section 161.001(1)(E), and a finding of only one ground in 161.001(1) is sufficient to support termination, along with a best interests finding, we need not consider Mother and Father's first issue. *See In re A.V.*, 113 S.W.3d at 362.

In their third issue, Mother and Father challenge the legal and factual sufficiency of the evidence supporting the jury's finding that it was in the best interest of the child to terminate the parent-child relationship. Before terminating a parent's rights, the factfinder also must find that

terminating the parent's rights is in the child's best interest. TEX. FAM. CODE ANN. § 161.001(2); *see also In re A.V.*, 113 S.W.3d at 362 (noting that primary focus of termination proceeding in trial court and on appeal is protecting best interest of child). In reviewing the sufficiency of the evidence to support a finding that termination is in the child's best interest, a court examines several factors, including the desires of the child; the child's current and future emotional and physical needs; any emotional or physical danger to the child; the parental abilities of the persons seeking custody and their plans for the child; the programs available to assist those persons seeking custody in promoting the best interest of the child; the stability of the home; acts or omissions by a parent tending to show the existing relationship is not a proper one; and any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (listing factors used for determining best interest of child). These factors are not exhaustive, and some of the listed factors may be inapplicable to some cases. *In re C.H.*, 89 S.W.3d at 27.

While there is a strong presumption that keeping the child with a parent is in the child's best interest, *see* TEX. FAM. CODE ANN. § 153.131(b) (West 2014), the prompt and permanent placement of the child in a safe environment also is presumed to be in the child's best interest. *Id.* § 263.307(a) (West 2014). Section 263.307(b) of the family code lists the factors to consider in determining whether the child's parents are willing and able to provide the child with a safe environment. *See* TEX. FAM. CODE ANN. § 263.307(b)(1)–(13) (West 2014). The statutory best interest factors include, among other things, the child's age and physical and mental vulnerabilities; the magnitude, frequency, and circumstances of the harm to the child; whether there is a history of abusive conduct by the child's family; the willingness and ability of the child's family to effect positive environmental and personal changes; and whether the child's

–20–

family demonstrates adequate parenting skills, including providing the child and other children in the family's care with minimally adequate health and nutritional care. *Id.*

As discussed above, Mother and Father had a history of failing to provide regular meals for their young children, even after education and counseling on the subject. Three of the children were diagnosed with failure to thrive as a result of their inadequate nutrition. Evidence showed Mother and Father were not willing and able to change their behavior in this regard. Further, there was evidence their older children were dirty and unkempt and neglected physically as well as nutritionally. There was also evidence Mother and Father were unable to provide a stable home environment, moving and changing jobs frequently, and living in motels and unsuitable apartments. J.W.C.'s foster family planned to adopt him, and four of his siblings lived with him. Based on our review of the record, we conclude the evidence presented at trial and summarized above is legally and factually sufficient to support the jury's findings that termination of Mother's and Father's parental rights was in J.W.C.'s best interest. *See* TEX. FAM. CODE ANN. § 161.001(2); *Holley*, 544 S.W.2d at 371–72.

We affirm the trial court's decree of termination.


/Ada Brown/
ADA BROWN
JUSTICE

141569F.P05

–21–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

IN THE INTEREST OF J.W.C., A CHILD

No. 05-14-01569-CV

On Appeal from the 301st Judicial District Court, Dallas County, Texas
Trial Court Cause No. DF-13-17254-T.
Opinion delivered by Justice Brown. Justices Lang and Whitehill participating.

In accordance with this Court's opinion of this date, we **AFFIRM** the trial court's decree of termination.

It is **ORDERED** that appellee, the State of Texas, recover its costs of this appeal from appellants James Cook and Shaunice Cook.

Judgment entered this 27th day of May, 2015.